IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RONALD GODWIN,

                Plaintiff,

       v.

ROGUE VALLEY YOUTH CORRECTIONAL
FACILITY, KEN JERIN, superintendent;
OREGON YOUTH AUTHORITY; COLETTE
PETERS, Director; JEAN STRAIGHT, an
Individual employed by the OYA; CITY OF
GRANTS PASS, JOHN and JANE DOE,

                Defendants.

Case No. 1:12-cv-00478-CL

**REPORT AND
RECOMMENDATION**

---

CLARKE, Magistrate Judge.

      This matter comes before the court on State defendants' motion for summary judgment

(#70), Grants Pass' motion for summary judgment (#73), and plaintiff's motion for summary

judgment against RVYCF and OYA ("State defendants") (#87). For the reasons stated below,

the court recommends that plaintiff's motion for summary judgment be DENIED, Grants Pass'

motion be GRANTED, and State defendants' motion for summary judgment be GRANTED in

part and DENIED in part.

## PROCEDURAL HISTORY

Plaintiff Ronald Godwin ("plaintiff") originally filed this action on March 16, 2012. On July 12, 2013, the court granted defendants' motion to dismiss plaintiff's due process and equal protection claims, but allowed plaintiffs remaining First Amendment claims and state tort law claims to go forward. Oral argument occurred via telephone on October 29, 2013. This court has jurisdiction over plaintiff's civil rights claims against the State defendants under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. This court has supplemental jurisdiction over plaintiff's state law claims against Grants Pass pursuant to 28 U.S.C. § 1367(a).

## BACKGROUND

Plaintiff began working at Rogue Valley Youth Correctional Facility ("RVYCF") in Grants Pass, Oregon in 1996 as a volunteer coordinator. RVYCF is operated by the Oregon Youth Authority ("OYA"), a correctional department responsible for housing and reforming at-risk youth. After the volunteer coordinator position was terminated, plaintiff entered into a services contract with the OYA to provide "spiritual services coordination" to youth offenders at RVYCF. Plaintiff served as the Volunteer Coordinator, Religious Services Director, and Chaplain at RVYCF for fourteen years. As such, plaintiff worked closely in a mentorship role with youth offenders at RVYCF. Dep. Godwin 200, 202.

In the summer of 2010, a member of the Grants Pass Police Department called OYA's main office in Salem, Oregon and informed the office that plaintiff was a member of the Vagos Motorcycle Club ("Vagos"). Shortly thereafter, plaintiff received a notification of suspension from RVYCF pending a review of the allegations submitted to the OYA Professional Standards office.

Plaintiff contacted the investigator from OYA's Professional Standards office, Ken Jeske. He admitted to Jeske that he once was a member of Vagos, but stated that he is no longer an active member.  Plaintiff explained that Vagos has no political agenda and exists solely for its members to ride motorcycles and enjoy the open road together.  Past and present Vagos club members wear club clothing; plaintiff stated that inactive members appear no different from active Vagos members to the general public while wearing club clothing.  There is thus no way for a person in the community to distinguish an inactive Vagos member from an active member. Dep. Godwin, 85-86, 207.  Plaintiff told Jeske that he still had his Vagos coat, and that he "may have" worn it to a club party recently.

Investigator Jeske also spoke with Chief Landis of Grants Pass police.  Landis told Jeske that plaintiff had been seen on multiple recent occasions wearing Vagos colors and riding with the Vagos.  He reported that on one of these occasions plaintiff "flipped off" a Grants Pass police officer while riding his motorcycle and wearing Vagos colors.  On another occasion, plaintiff was pulled over by Grants Pass police while riding with seven Vagos members.  Plaintiff had been seen in Grants Pass wearing Vagos colors and clothing on other occasions as well.

Jeske completed his investigation and wrote a report to the OYA officials in Salem.  In August of 2010 defendants Straight and Jerin made a recommendation and final decision to Colette Peters, director of the OYA, based on Jeske's report.  Peters subsequently made the decision to terminate plaintiff.

On August 10, 2010, plaintiff received a letter of termination, effective September 15, 2010.  Straight informed plaintiff that his "contract was terminated based on the recent activities/involvement with the Vagos Organization."  Plaintiff now brings this action, alleging wrongful termination and breach of contract against State defendants, and intentional

interference with a business contract against Grants Pass. Plaintiff's complaint alleges that State defendants wrongfully terminated him in retaliation for exercising his First Amendment right to free speech, thereby violating his employment contract, and he moves for summary judgment on those claims. The State defendants filed a motion in response, also asking for summary judgment. Grants Pass moves for summary judgment on plaintiff's state law claims, and plaintiff has filed a response.

## SUMMARY JUDGMENT

The court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Philip Morris, Inc.,* 395 F.3d 1142, 1146 (9th Cir. 2005) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court views the evidence in the light most favorable to the non-moving party and draws "all justifiable inferences" in that party's favor. *Miller v. Glenn Miller Prods., Inc.,* 454 F.3d 975, 988 (9th Cir. 2006) (*quoting Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (*quoting* FED. R. CIV. P. 56(e)). Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir. 1989) (*quoting Angel v. Seattle-First Nat'l Bank*, 653 F.2d 1293, 1299 (9th Cir. 1981)).

## DISCUSSION

### I.     Motion for Summary Judgment on Claims against Straight and Jerin

The State defendants first argue that the claims against State employees Ken Jerin and

Jean Straight should be dismissed because Colette Peters made the decision to terminate plaintiff.

A person can be liable for the deprivation of a constitutional right under § 1983 if he participates

in another's affirmative act. *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir. 1978). The "requisite

causal connection [for § 1983 liability] can be established not only by some kind of direct

personal participation in the deprivation, but also by setting in motion a series of acts by others

which the actor knows or reasonably should know would cause others to inflict the constitutional

injury." *Id.* at 743-44. Subordinates can be held liable for a constitutional violation if their

actions were part of the final decision that constitutes the violation. *Gilbrook v. City of

Westminster,* 177 F.3d 839, 854-55 (9th Cir. 1999).

Plaintiff made the following factual allegations against defendants Jerin and Straight:

"The Superintendent of [RVYCF] is Ken Jerin." Compl. ¶4. "At all times herein Ms. Jean

Straight was employed with the State of Oregon and [OYA] and was acting within the course

and scope of her employment as Assistant Director of Business Services." *Id.* at ¶5. "An

undisclosed member or members of the Grants Pass Police told Jean Straight and/or others at the

OYA and RVYCF, that they wanted and expected [plaintiff] to be fired from his position at

RVYCF because of his alleged motorcycle club membership." *Id.* at ¶9.

Plaintiff argues that Straight and Jerin were both involved in the decision to terminate

plaintiff's employment. Pl.'s Mem in Opp. 4. Plaintiff now alleges that Straight and Jerin

reviewed the report from Jeske and discussed their options with respect to plaintiff. Plaintiff also

alleges the Straight and Jerin made recommendations to Peters as to how OYA should go about

terminating plaintiff's employment.  Viewing all allegations in the light most favorable to the

plaintiff, the court finds that plaintiff has alleged facts sufficient for a reasonable jury to find that

Jerin and Straight took actions that were "part of the final decision" to terminate him.  State

defendants' motion for summary judgment should therefore be denied on this issue.

## II.     Cross Motions for Summary Judgment on First Amendment Claims

Plaintiff argues that his First Amendment retaliation claims should succeed on summary

judgment because (1) plaintiff's association with the Vagos Motorcycle Club addressed a matter

of public concern, and (2) defendants' administrative interests did not outweigh plaintiff's first

amendment rights.

To prevail on a first amendment retaliation claim, a public employee must show that (1)

he engaged in protected speech; (2) the government employer took an "adverse employment

action" against the employee; and (3) that the protected speech was a "substantial or motivating

factor" for the adverse employment action.  *Coszalter v. City of Salem,* 320 F.3d 968, 973 (9th

Cir. 2003).  This framework also applies to plaintiff as an independent contractor.  *See Bd. Of

Cnty. Comm'rs Wabaunsee Cnty, KS v. Umbehr*, 518 U.S. 668, 678-80 (1996).  It is uncontested

that RVYCF took an adverse employment action against plaintiff because of his association with

the Vagos motorcycle club.[1]  The issue is whether plaintiff engaged in protected speech; more

specifically, we must consider whether plaintiff's conduct was expressive, and if so, whether it

was protected under the First Amendment.

### 1. Was Plaintiff's Conduct Expressive?

---

[1] The State Defendants also found plaintiff not to be truthful in his responses to Jeske's investigation.  Dep.
Peters 10-11, 13, 16, 22, 25.  This constitutes an additional reason for terminating plaintiff's contract that is
unrelated to protected speech.  However, plaintiff's membership in Vagos appears to be a substantial factor in the
adverse employment action.

In the Ninth Circuit, conduct is expressive when "[a]n intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington,* 418 U.S. 405, 410-11 (1974) (per curiam).  Context is crucial when determining whether conduct rises to the level of expression for purposes of the First Amendment. *Villegas v. City of Gilroy*, 484 F.3d 1136, 1140 (9th Cir. 2007).  In *Sammartano v. First Judicial District Court*, 303 F.3d 959 (9th Cir. 2002), the Ninth Circuit recognized that a patch on a motorcycle club member's vest constitutes expressive conduct for purposes of the First Amendment.  Here, plaintiff has alleged sufficient facts to create an issue of fact whether plaintiff intended to convey a message of approval or association with the Vagos by riding his motorcycle in public while wearing the Vagos cut and colors.  The court thus finds that plaintiff's conduct was expressive for purposes of the First Amendment.

### 2. Was Plaintiff's Conduct Protected?

In analyzing whether a public employee engaged in protected speech, the court uses the balancing test set forth in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1981).  The *Pickering* test involves a two-part inquiry: (1) whether the speech at issue related to a matter of public concern, and (2) whether the employer can demonstrate that its legitimate interests in avoiding workplace disruption outweighed the public employee's First Amendment rights.  *Hudson v. Craven*, 403 F.3d 691, 695 (9th Cir. 2005).  The *Pickering* test applies to independent contractors to protect them from termination when the government's action is taken in retaliation for expressive activity.  *Board of Comm'rs., Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668 (1996) (holding that the *Pickering* test can accommodate the differences between government employees and independent contractors).

## A. Matter of Public Concern

Whether speech addresses a matter of public concern is a question of law for the court. *Connick v. Myers*, 461 U.S. 138, 150 n.10 (1983). The court must consider a statement's "content, form, and context … as revealed by the whole record." *Id.* at 147-48. The essential question is "whether the speech addressed matters of 'public' as opposed to 'personal' interest." *Desrochers v. City of San Bernadino,* 572 F.3d 703, 709 (9th Cir. 2009) (citing *Connick*, 461 U.S. at 147).

The Ninth Circuit has held that wearing of motorcycle club vests and insignia in a public setting, without more, is not expression protected by the First Amendment. *Villegas v. City of Gilroy*, 484 F.3d 1136, 1139-40 (9th Cir. 2007). In that case, the court held that wearing a club's insignia and vest did not rise to the level of public concern where the motorcycle club had no official political, religious or other viewpoints. In *Villegas*, members of a motorcycle gang sued for damages after being excluded from a city park during a garlic festival for wearing vests adorned with a common insignia symbolizing membership in the gang. *Id.* at 1137-38. Relevant to the court's decision was the fact that members of the gang stated they did not advocate any political, religious, or other viewpoints. *Id.* at 1140 (upholding the district court's ruling that the plaintiffs' wearing of vests did not manifest 'an intent to convey a particularized message') (citing *Spence*, 418 U.S. at 410-11). The *Villegas* court also determined that it was unlikely that "any message would be understood by those viewing the plaintiffs' vests." *Id.* Based on the plaintiffs' lack of intent to express a particularized message and the context of the expressive activity, the Ninth Circuit held that the *Villegas* plaintiffs were not entitled to First Amendment protection. *Id.*

Similarly, the court finds that plaintiff's expressive conduct was not a matter of public concern. Plaintiff correctly notes that, unlike the plaintiffs in *Villegas*, he was a public employee charged with mentoring at-risk youth and juvenile offenders when the alleged expressive conduct occurred. While the Vagos admittedly have no political agenda, the FBI maintains a website listing Vagos as an outlaw motorcycle gang. State's Mem. in Support, Ex. 2. In *Piscottano v. Murphy*, 511 F.3d 247 (2d Cir. 2007), plaintiffs were fired from their government jobs because of their association with a motorcycle club, the Outlaws. In *Piscottano*, the court stated that "[t]he fact that law enforcement agencies believe the Outlaws and many of its chapters engage in criminal activity is sufficient in itself to make the nature of those entities a matter of public concern." *Id.* at 274-75.

While the facts in *Piscottano* closely resemble the facts in this case, the Ninth Circuit requires intent to convey a particularized message of public concern in order to warrant First Amendment protection. *Villegas*, 484 F.3d at 1140. Although the issue of whether a public employee who mentors at-risk youth belongs to a criminal organization is a matter of concern to the public, *Thomas* 379 F.3d at 809 (9th Cir. 2004) (noting that, in the Ninth Circuit, "[u]nlawful conduct by a government employee ... is a matter of public concern), there is no evidence that plaintiff intended to express a message of belonging to a criminal organization. Plaintiff denies that he is an active member of the Vagos, and moreover denies that the Vagos is properly thought of as a criminal organization. He also contends that his purpose in riding with the Vagos was simply to enjoy the open road and not to express any political message. Thus, the court finds that plaintiff's conduct, while expressive, does not constitute speech on a matter of public concern.

## B. Legitimate Interests of Employer

Even assuming that the Ninth Circuit allows us to consider the broader context in the absence of any subjective intent on the part of the plaintiff to express a matter of public concern, plaintiff's conduct fails to warrant First Amendment protection because the State had a legitimate interest to terminate plaintiff's employment that outweighed plaintiff's First Amendment interest. If speech involves a matter of public concern, the government bears the burden of justifying its adverse employment action. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987); *see also Waters v. Churchill*, 511 U.S. 661, 669 (1994). As an employer, the State "has interests ... in regulating the speech of its employees that differs significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering*, 391 U.S. at 568. The court must balance the "interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*. "Application of this balancing test entails a specific factual inquiry into such matters as whether the speech (i) impairs discipline or control by superiors, (ii) disrupts coworker relations, (iii) erodes a close working relationship premised on personal loyalty and confidentiality, (iv) interferes with the speaker's performance of her or his duties, or (v) obstructs the routine operation of the office." *Hyland v. Wonder*, 972 F.2d 1129, 1139 (9th Cir. 1992). Time, place, and manner of the expressive activity are also relevant to the validity of the government action. *Connick v. Myers*, 461 U.S. 138 (1983).

Here, plaintiff's interest in the expressive activity is minimal. Plaintiff's expression is a matter of public concern precisely because it implicates him in an organization widely thought of as criminal, a reputation that plaintiff himself repudiates. The court must thus balance plaintiff's interest in expressing a message he alleges is false, against the State defendants' interest in

promoting the efficiency of the public services it performs through its employees. *See Hyland*, 972 F.2d at 1139 (the nature of the government's burden varies with the content of the protected speech) (citing *Connick*, 461 U.S. at 150).

The State defendants argue that the decision to terminate plaintiff served the government interest in "promoting efficiency and integrity in the discharge of official duties and maintaining proper discipline in the public service." State Def.'s Mot. 9 (citing *Connick*, 461 U.S. at 150-51). As noted, OYA's mission is to "protect the public and reduce crime by holding youth offenders accountable and providing opportunities for reformation in safe environments." *Id.,* Ex. 1. Apparent membership in an alleged criminal organization interferes with plaintiff's performance of his duties as a mentor. Arguably, it also erodes plaintiff's relationship with other state employees, and obstructs OYA's ability to execute its mission. *See Piscotanno v. Murphy*, 511 F.3d 247, 277 (2d Cir. 2007) (observing that the "DOC has an interest in avoiding even the appearance that its correctional officers have conflicts of interest"). Given plaintiff's position with juvenile offenders, it is clear that even perceived involvement with a criminal organization could interfere with the performance of his duties.

Plaintiff argues that the State defendants have failed to produce any evidence that his association with Vagos caused actual disruption in his work or interfered with any working relationships. Indeed, the State defendants have not alleged an "actual disruption" of coworker relations. Plaintiff cites *Allen v. Scribner,* 812 F.2d 426, 432 (9th Cir. 1987), *amended* 828 F.2d 1445 (9th Cir. 1987) and *McKinley v. City of Eloy,* 705 F.2d 1110, 1115 (9th Cir. 1983) for the proposition that any disruption must be "real [and] not imagined" to legitimize a government agency's dismissal of an employee for protected First Amendment activity. The Ninth Circuit states in *Allen*, however, that the government violates an employee's First Amendment right if it

appears "clearly unlikely" that the plaintiff's protected speech would cause a workplace disruption. As discussed above, this is not the case here. Further, the *McKinley* court requires "real" disruption *only* when the government relies exclusively upon factor (ii) to justify its adverse employment action, which is not the case here.[2]

Plaintiff also argues that some of the allegations made by Grants Pass police to the OYA are false. Regardless of whether plaintiff is an active Vagos member and was seen "flipping off" police officers in Grants Pass, however, Peters appeared to believe the reports when she decided to terminate plaintiff's contract with the OYA. *See Waters v. Churchill*, 511 U.S. 661 (1994) (plurality holding that an employer could discharge an employee for speaking on a matter of public concern based on facts as he reasonable believed them to be after investigation, even if it later turns out that he is mistaken). Because Peters' belief was reasonable on this record, the truth of the allegations by the Grants Pass police is immaterial. The court thus finds that OYA's termination of plaintiff's contract promotes a legitimate interest. Plaintiff's motion for summary judgment should therefore be denied and State Defendants' motion for summary judgment should be granted on this issue.

### III.    Grants Pass' Motion for Summary Judgment

Plaintiff alleges state law claims against Grants Pass for intentional interference with contract, both with respect to his contract with OYA and his job at the Grants Pass Cab Company. Grants Pass moves for summary judgment on plaintiff's state law claims, arguing that (1) the city did not improperly interfere with plaintiff's employment at OYA; (2) the city did not improperly interfere with plaintiff's employment as a taxi driver; and (3) all "Doe" defendants

---

[2] Disruption is thus *not* the only factor to be weighed, and plaintiff's association with the Vagos could be considered a threat to safety, pose conflicts of interest, and interfere with the integrity of OYA's operations. *See Piscotanno*, 511 F.3d at 277.

named in the complaint have not received proper service and all claims against Does should be dismissed.

### 1. Intentional Interference with Contract

To prevail on a claim of intentional interference with contract ("IIC"), plaintiff must prove six elements: (1) the existence of a professional or business relationship, which could include, e.g., a contract or a prospective economic advantage, (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages. *See, e.g., McGanty v. Staudenraus,* 321 Or. 532, 535 (Or. 1995). The court finds that plaintiff's claim against Grants Pass for intentional interference with his OYA contract cannot survive summary judgment because there is no issue of fact as to whether plaintiff satisfies the fourth element of IIC.

### A. Plaintiff's Contract with OYA

To prevail on his IIC claim, plaintiff must show "[e]ither the pursuit of an improper objective of harming plaintiff or the use of wrongful means that in fact cause injury to plaintiff contractual or business relationships." *Bugge v. Far West Federal Bank, S.B.*, 100 Or. App. 133, 141-42 (Or. App. 1990) (quoting *Top Service Body Shop, Inc. v. Allstate Ins. Co.,* 283 Or. 201, 205 (Or. 1978)). Here, plaintiff alleges that Deputy Chief Landis used improper means in communicating with the OYA. Oregon courts have defined "improper means," stating that such means "may be wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession." *Top Service Body Shop, Inc. v. Allstate Ins. Co.,* 582 P.2d 1365 (Or. 1978). "Improper means" must be independently wrongful by reason of statutory or common law, and include "violence, threats,

intimidation, deceit, misrepresentation, bribery, unfounded litigation, defamation and disparaging falsehood." *Conklin v. Karban Rock, Inc.*, 94 Or. App. 593, 601, 767 P.2d 444, *rev. den.*, 307 Or. 719 (Or. 1989). That is, the means must be wrongful in some manner other than simply causing the damages claimed as a result of the conduct. *Id.*

As noted, plaintiff alleges that Deputy Chief Landis informed the OYA that plaintiff was a "patch wearing member of a documented criminal organization." Decl. Godwin, Ex. 5. Grants Pass also informed the OYA that plaintiff was seen flipping off a police officer. Plaintiff contests the veracity of these allegations, arguing that Landis "misrepresented Plaintiff's involvement in the Vagos motorcycle club." [3]  Pl.'s Mem. in Opp., 19. Insofar as plaintiff alleges that Landis misrepresented the facts, however, he does not allege that Landis made a knowingly false statement sufficient to satisfy the "improper means" standard.

It is undisputed that Landis contacted the OYA office for the purpose of reporting on plaintiff's police encounters and to inquire as to OYS's employment policies. Landis apparently believed plaintiff was an active member of the Vagos based on his dress and did not knowingly provide false information to the OYA.[4] As noted, plaintiff admits that there is no way to distinguish between a retired Vagos member and a current Vagos member simply by appearance, and that he continued to wear his Vagos clothing even as a retired member. Dep. Godwin 85-86, 207. While plaintiff correctly notes that Landis "had no proof" that plaintiff was involved in

---

[3] Plaintiff also argues that Landis' report to Peters "became political within the department when [Landis] went over the head of Plaintiff's direct supervisor and spoke to the Director of OYA." Pl.'s Mem in Opp., 19. This vague allegation does not raise an issue of fact as to Landis' use of improper means.

[4] Plaintiff alleges that Grants Pass acted from an improper purpose due to a longstanding relationship between plaintiff and Corporal Gaunt of the Grants Pass Police Department, who had a history with plaintiff's daughter. Even if plaintiff pleaded facts to establish Gaunt's improper purpose or motive, however, he does not allege that Gaunt made contact with the OYA. Plaintiff thus does not allege a sufficient causal relationship between Gaunt and the harm to plaintiff's relationship with OYA to satisfy the fifth element of his tort claim.

criminal activity by associating with the Vagos, mere lack of proof does not suggest misconduct rising to the level of intentional misrepresentation sufficient to state a claim for IIC.[5]

Landis' actions were justified in light of his role as Deputy Chief of the Grants Pass Police Department. "A person who interferes with a contract is not always responsible for the resultant injury. If he is promoting an interest which is equal or superior in social value to that with which he interferes, his actions are said to be privileged or justified." *Wampler v. Palmerton,* 250 Or. 65, 74 (Or. 1968). As a law enforcement agency, the Grants Pass Police Department has a legitimate interest in preventing members of criminal organizations from influencing at-risk youth and juvenile offenders in the community. Based on the record, Landis' motivation appeared to be in line with proper law enforcement concerns. *See Top Service,* 283 Or. at 212 (in general, when determining whether an act was "proper," a defendant's subjective judgment as to its own business purposes will control); *see also Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or. 487, 498 (Or. 1999) (same). Viewing the evidence in the light most favorable to the plaintiff, the court cannot find an issue of fact regarding improper means or motive. *See Boers v. Payline Systems, Inc.*, 141 Or. App. 238, 245 (Or. App. 1996) (improper motives exist where the actions are taken for self-serving or vindictive purposes). Thus, Grants Pass' motion should be granted.

Plaintiff's claim also fails to satisfy the fifth, causal element of IIC, because he has not shown that Grants Pass caused damage to plaintiff's economic relationship with OYA. Prior to its termination decision OYA conducted an independent investigation of plaintiff's case. While the allegations from the Grants Pass Police Department may have set a causal chain in motion, OYA's investigation, the discussion of plaintiff by RVYCF staff, and the final termination

---

[5] Plaintiff does not allege that Landis knew he was not a member of the Vagos at the time he contacted OYA. *See* Pl.'s Mem in Opp., 21 n.61.

decision by Peters constitute intervening causes sufficient to preclude Grants Pass from liability for this tort claim. Similarly, the causal connection alleged between Corporal Gaunt's act of informing Landis that plaintiff was seen wearing the Vagos colors and OYA's decision to terminate plaintiff is too tenuous to sustain plaintiff's tort claim against Gaunt. For this reason and the reasons stated above, Grants Pass' motion for summary judgment should be granted.

### B. Plaintiff's Contract with the Grants Pass Cab Company

Plaintiff also fails to meet the elements his IIC claim against Grants Pass arising from the loss of his job as a taxi driver. After he lost his job with OYA, plaintiff began working for the Grants Pass Cab Company. In October of 2010, an unnamed officer at the Grants Pass Police Department called plaintiff's employer and reported that plaintiff did not have a valid taxi license. Decl. Godwin. Plaintiff's employer, Carl Campbell, told plaintiff that he would be put on leave until he took the necessary steps to renew his taxi license. Decl. Warren, Ex. 3. Plaintiff subsequently quit his position at the cab company. Because plaintiff does not dispute the validity of his taxi license and does not alleged that Grants Pass misrepresented facts to his employer, he has not met the "improper means or purpose" prong of his tort claim. Plaintiff thus fails to satisfy the elements of a claim of intentional interference with contract, and Grants Pass' motion for summary judgment on this issue should be granted.

### 2. Doe Defendants

Grants Pass argues that the Doe defendants were not properly served and that all claims against Doe defendants should be dismissed.[6] Grants Pass also argues that the Oregon Tort Claims Act ("OTCA") limits plaintiff's state tort claim to the City of Grants Pass only, and not

---

[6] Plaintiff in turn asks for leave to amend his original complaint to replace the Doe defendants with proper-named defendants pursuant to FED. R. CIV. P. 15.

the Doe defendants.[7]   Because Grants Pass' motion to dismiss should be granted on all of

plaintiff's tort claims, however, the court need not consider these arguments.

### RECOMMENDATION

For the foregoing reasons, plaintiff's motion for summary judgment should be denied,

State defendants' motion for summary judgment should be granted in part and denied in part, and

Grants Pass' motion for summary judgment should be granted.

The above Report and Recommendation will be referred to a United States District Judge

for review. Objections, if any, are due no later than fourteen days from service of the Report and

Recommendation. The parties are advised that the failure to file objections within the specified

time may waive the right to appeal the District court's order. *See Martinez v. Ylst*, 951 F.2d

1153, 1156 (9th Cir. 1991). If no objections are filed, review of the Report and Recommendation

will go under advisement on that date. If objections are filed, any party may file a response

within fourteen days after the date the objections are filed.   Review of the Report and

Recommendation will go under advisement when the response is due or filed, whichever date is

earlier.

DATED this _____ day of November, 2013

MARK D. CLARKE
United States Magistrate Judge

---

[7] The Oregon Tort Claims Act ("OTCA"), O.R.S. §§ 30.250 et seq., provides:
The sole cause of action for a tort committed by officers, employees or agents of a public body acting within the scope of their employment or duties … is an action under O.R.S. 30.260 to 30.300. … No other form of civil action is permitted.
O.R.S. § 30.265(2).