IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| RONALD GODWIN, | Civ. No. 1:12-cv-00478-MC |
| Plaintiff, | **OPINION & ORDER** |
| v. | |
| ROGUE VALLEY YOUTH CORRECTIONAL FACILITY; KEN JERIN; OREGON YOUTH AUTHORITY; COLETTE PETER; JEAN STRAIGHT; CITY OF GRANTS PASS; JOHN and JANE DOE, | |
| Defendants. | |

McSHANE, District Judge.

This matter comes before the Court on Motions for Summary Judgment filed by Plaintiff Ronald Godwin and Defendants Ken Jerin, Colette Peters, and Jean Straight (collectively "the State Defendants,").[1] ECF Nos. 130, 132. The Court heard oral argument on the motions on August 9, 2017. ECF No. 153. For the reasons set forth below, the State Defendants' Motion for Summary Judgment is GRANTED. Godwin's Motion for Summary Judgment is DENIED as MOOT.

---

[1] Godwin voluntarily dismissed his claims against Defendants Oregon Youth Authority ("OYA") and Rogue Valley Youth Correctional Facility ("RVYCF") in response to the State Defendants' earlier Motion for Judgment on the Pleadings. ECF No. 37.

# BACKGROUND

## I. Factual Background

The Oregon Youth Authority ("OYA") is a state correctional agency responsible for housing and reforming youth offenders. The mission of OYA "is to protect the public and reduce crime by holding youth offenders accountable and providing opportunities for reformation in safe environments." Lippold Decl. Ex. 1, at 1, ECF No. 131. Defendant Colette Peters was the Director of OYA in 2010. Compl. 3. Defendant Jean Straight was the Assistant Director of Business Services for OYA in 2010. Compl. 3. The OYA operates the Rogue Valley Youth Correctional Facility ("RVYCF") in Grants Pass, Oregon. Defendant Ken Jerin was the Superintendent of RVYCF. Compl. 3.

Plaintiff Ronald Godwin was contracted by OYA to serve as the religious services coordinator, volunteer coordinator, and chaplain at RVYCF from 1997 until his termination in September 2010. Godwin Decl. ECF No. 88. In that capacity, Godwin was to provide "a full range of religious services," to the RVYCF residents, including arranging for the recruitment and coordination of religious volunteers and meeting individually with youth to identify religious needs. Lippold Decl. Ex. 1, at 1-2; Godwin Decl. The record reflects that Godwin's service was exemplary and he was honored with the Director's Award in March 2010. Godwin Decl.

Godwin was at one time a member of the Vagos Motorcycle Club. Godwin Decl. The 2011 National Gang Threat Assessment designated the Vagos as a criminal organization and "Outlaw Motorcycle Gang," or "OMG," known to be active and growing in Oregon.[2] Lippold Decl. Ex. 2, at 3, 5, 10. The Assessment noted that gang members, including members of

---

[2] The Assessment defined "Outlaw Motorcycle Gangs" as "organizations whose members use their motorcycle clubs as conduits for criminal enterprises." Lippold Decl. Ex. 2, at 3.

OMGs, were known to have applied for or gained employment with police, judicial, or correctional agencies nationwide:

> OMGs engage in routine and systematic exploitation and infiltration of law enforcement and government infrastructure to protect and perpetrate their criminal activities. OMGs regularly solicit information of intelligence value from government or law enforcement employees.
>
> [National Gang Intelligence Center] reporting indicates that gang members in at least 72 jurisdictions have compromised or corrupted judicial, law enforcement, or correctional staff within the past three years.

Lippold Decl. Ex. 2, at 8.

Although Godwin acknowledged that a number of Vagos from the Grants Pass area have been convicted of criminal activity, he described the group as motorcycle enthusiasts who join together to enjoy the open road. Lippold Decl. Ex. 4, at 18-20, 30. Godwin described himself as holding a "chaplain-type" role within the Vagos. Godwin Decl. Ex. 12, at 1; Lippold Decl. Ex. 4, at 17. There is no indication that Godwin had personally engaged in any criminal activity, either as a member of the Vagos or otherwise. Lippold Decl. Ex. 6, at 2; Ex. 8, at 4. Godwin "retired" from membership in the Vagos in 2003. Lippold Decl. Ex. 4, at 2.

Members of the Vagos advertise their affiliation by wearing the Vagos "cut" and "colors," including a patch depicting the Norse god Loki. Lippold Decl. Ex. 4, at 3-4, 10. As a retired member, Godwin was permitted to wear the cut and colors of the Vagos when attending club functions or with the permission of the local chapter president. Lippold Decl. Ex. 4, at 4-5. There are no special insignia or markings that would distinguish the cut and colors of a retired member of the Vagos from those of an active member. Lippold Decl. Ex. 4, at 11-12.

In 2010, Grants Pass police observed Godwin wearing the Vagos cut and colors on "numerous" occasions, both alone and when riding in the company of other Vagos. Lippold Decl. Ex. 3, at 3-4. In particular, the Grants Pass police reported that on April 30, 2010, Godwin

was seen riding his motorcycle in full Vagos regalia and that he made a rude gesture at a passing police cruiser, and that on June 25, 2010, Godwin was involved in a traffic stop while wearing his Vagos cut and colors and riding with five to seven members of the Vagos. Lippold Decl. Ex. 3, at 3-4. Godwin acknowledges at least some of those incidents, although he denies directing a rude gesture at the police. Lippod Decl. Ex. 3, at 2; Ex. 4, at 29; Godwin Decl. Ex.23, at 1-2. On July 9, 2010, Grants Pass Police Chief Bill Landis contacted the OYA headquarters to report that Godwin was a "patch-wearing member of a documented criminal organization." Lippold Decl. Ex. 3, at 2. OYA suspended Godwin's employment pending their investigation into Landis's allegations. Godwin Decl.; Lippold Decl. Ex. 7, at 2.

Godwin maintains that he never concealed his membership in the Vagos, either before or after his retirement from the group. Godwin Decl. Godwin says that several of his co-workers, including supervisors, knew of his involvement with the Vagos. Godwin Decl. The record is not clear how widespread the knowledge of Godwin's association actually was, however. The record contains a number of declarations from Godwin's coworkers indicating that they were either unaware of his association with the Vagos until 2010, or that they believed his association was historical rather than current. *See* Second Lippold Decl. Ex. 2 (Decl. of Doug Williams); Ex. 7 (Decl. of Pam Boston); Ex. 8 (Decl. of Louise Pizer); Ex. 10 (Decl. of Matt Sweeney), ECF No. 139. Many of these coworkers expressed dismay at learning that Godwin had been seen in the community wearing Vagos colors while working for OYA. Jerin also testified that he was not aware of anyone at RVYCF who knew of Godwin's association with the Vagos. Second Lippold Decl. Ex. 4, at 2.

On July 12, 2010, Director Peters assigned Ken Jeske of the OYA Professional Standards Office to investigate the reports of Godwin's membership in the Vagos. Lippold Decl. Ex. 3, at

2; Ex. 6, at 3. On July 15, 2010, Godwin called Jeske to give a statement. Godwin admitted his past membership in the Vagos, but told Jeske that he had retired from the organization. Lippold Decl. Ex. 3, at 2. Godwin stated that he was aware of the organization's criminal activity "through the newspaper" and from statements made by other Vagos. Lippold Decl. Ex. 3, at 2. Godwin admitted that he still had his Vagos cut and colors and gave contradictory statements about his recent involvement with the Vagos. Lippold Decl. Ex. 3, at 2 ("He stated he had not be involved with them [the Vagos] for 15 to 20 years.") ("He stated he did attend [a recent Vagos function] and did wear his coat containing the patch in question."), at 2-3 ("He stated that he does not attend any club functions and described the recent reported activity as a 30 club Run. . . ."), and at 3 ("Godwin stated he has not worn his coat or attended any Vagos functions prior to this event or following."). Jeske informed Godwin that local law enforcement had expressed concerns about Godwin's affiliation with the Vagos and told Godwin that "by wearing those colors he was supporting a criminal organization and representing Rogue Valley Youth Correctional Facility as a contractor for religious services." Lippold Decl. Ex. 3, at 3. Godwin stated that he used his past experiences and involvement with the Vagos as a positive example of personal reform and self-improvement in his work at RVYCF. Lippold Decl. Ex. 3, at 3. Godwin offered to stop wearing his Vagos cut and colors and to disassociate himself from the organization. Godwin Decl.; Lippold Decl. Ex. 3, at 3.

On July 16, 2010, Jeske submitted his investigative report, in which he noted Godwin's explanations, but concluded that "law enforcement reports multiple incidents indicating Godwin is currently associating with a known criminal element tracked by multiple law-enforcement agencies as a national threat." Lippold Decl. Ex. 3, at 1-2.

Jean Straight also called Godwin during the investigation to ask him if he had attended any local events while wearing his Vagos colors. Godwin Decl. Godwin told her that he remembered that he had worn his Vagos patches at "a couple of local events." Godwin Decl. This statement would appear to contradict at least some of what Godwin told Jeske about the extent of his involvement with the Vagos in 2010.

Jeske's report was reviewed by Straight, Jerin, and Peters. In her deposition, Peters testified that she believed Godwin's association with the Vagos and his public display of Vagos colors ran counter to the mission of the OYA. Second Lippold Decl. Ex. 1, at 6. Peters felt that Godwin's association with the Vagos would create a perception that "would have interfered with [Godwin's] ability to help in the transformation or reformation of the youth in our care and custody." Second Lippold Decl. Ex. 1, at 4. Peters observed that an OYA employee's reputation in the community "bleed[s] into their work." Lippold Decl. Ex. 9, at 9. She was worried about how far knowledge of Godwin's involvement with the Vagos had already spread or would spread in the future. Lippold Decl. Ex. 9, at 9. Peters expressed concern that Godwin's association with the Vagos presented a threat to the safety and security of the institution. Second Lippold Decl. Ex. 1, at 8-9.

Ken Jerin also expressed concern about an OYA representative publically associating with members of a criminal organization. Second Lippold Decl. Ex. 4, at 6-7. Jerin was especially concerned because Godwin's role as religious services coordinator put him in a position of mentorship with the youth at the facility. Jerin worried that if those youths were to see Godwin publically wearing Vagos colors, it would send a message contrary to OYA's mission of rehabilitation. Second Lippold Decl. Ex. 4, at 7-8. Jerin felt that knowledge of Godwin's association with the Vagos would create a perception among RVYCF staff that

Godwin supported criminal activity in the community. Such perceptions, he felt, would be damaging to employee morale. Second Lippold Decl. Ex. 4, at 7.

Straight agreed that Godwin's association with the Vagos compromised his ability to work in a youth correctional facility. Second Lippold Decl. Ex. 6, at 2. Straight testified that, as far as she knew, none of the residents of the facility knew of Godwin's association with a criminal organization and she believed that it would send a counter-productive message if they were to learn of his membership in the Vagos. Second Lippold Decl. Ex. 6, at 2.

Based on Jeske's report, and after a conference with Straight and Jerin, Peters determined that Godwin's contract should be terminated. Lippold Decl. Ex. 7, at 2; Ex. 9, at 14; Ex. 10, at 2. On August 10, 2010, Straight sent a letter to Godwin informing him that his contract with OYA was terminated, effective September 15, 2010. Godwin Decl. Ex. 32. Godwin emailed Straight to ask the reason for his termination and was told that it was due to "recent activities/involvement with the Vagos Organization." Godwin Decl. Ex. 33.

## II. Procedural Background

Godwin commenced this action on March 16, 2012. ECF No. 1. On November 7, 2013, Magistrate Judge Clarke recommended that summary judgment be granted in favor of the State Defendants. ECF No. 98. On December 20, 2013, Senior District Judge Panner adopted Judge Clarke's recommendation over Godwin's objections. ECF No. 106.

Godwin appealed the decision and, on August 10, 2016, a divided panel of the Ninth Circuit reversed the grant of summary judgment and remanded the case for further proceedings. *Godwin v. Rogue Valley Youth Corr. Facility (RVYCF)*, 656 F. App'x 874 (9th Cir. 2016). On December 15, 2016, the Ninth Circuit denied a petition for an *en banc* rehearing. ECF No. 117.

Following remand, the case was reassigned to this Court. ECF No. 127. Discovery was reopened and the pending motions followed. ECF Nos. 126, 129, 130, 132.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011); Fed. R. Civ. P. 56(a). The moving party must show the absence of a dispute as to a material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine dispute as to a material fact for trial. *Id.* "This burden is not a light one . . . . The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citations omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarmo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must draw all reasonable inferences in favor of the non-moving party. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004). A "mere disagreement or the bald assertion that a genuine issue of material fact exists" is not sufficient to preclude the grant of summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989). When the non-moving party's claims are factually implausible, that party must "come forward with more persuasive

evidence than otherwise would be necessary[.]" *LVRC Holdings, LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009) (internal quotation marks and citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006). If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Id.*

## DISCUSSION

The sole claim remaining in this case is that the individual State Defendants wrongfully terminated Godwin in violation of his First Amendment rights to free speech and association. The State Defendants move for summary judgment on the basis of qualified immunity. Godwin opposes the State Defendants' motion and, in his own motion, argues that the Ninth Circuit's decision compels summary judgment in his favor, based on the law of the case doctrine.

### I.  Public Employee First Amendment Rights and the *Pickering* Balancing Test

A state "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983). Public employees, do not, however, enjoy an absolute right to free speech. *Nichols v. Dancer*, 657 F.3d 929, 932 (9th Cir. 2011).

In order to state a *prima facie* case for a hybrid speech/association claim, a public employee plaintiff must show that: (1) he engaged in protected speech and/or association; (2) the defendants "took an adverse employment action" against him; and (3) the plaintiff's speech or association was "a substantial or motivating factor for the adverse employment action." *Hudson v. Craven*, 403 F.3d 691, 695 (9th Cir. 2005) (internal quotation marks and citation omitted). In this case, there is no dispute that Godwin was terminated for his association and expressive

conduct related to the Vagos. *Godwin*, 656 F. App'x at 875. The Ninth Circuit also held that Godwin's expression and association related to a matter of public concern and were therefore protected by the First Amendment. *Id.* at 875-76. On remand, the State Defendants concede this issue.

Once the plaintiff has established a *prima facie* case, the defendant bears the burden of showing that its legitimate interest as an employer "'in promoting the efficiency of the public services it performs through its employees,' outweighs the plaintiff's First Amendment Rights. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (quoting *Pickering v. Bd. Of Educ.*, 391 U.S. 563, 568 (1968)); *Godwin*, 656 F. App'x at 876.

The *Pickering* balancing test requires "a factual inquiry into such matters as whether the speech (i) impairs discipline or control by superiors, (ii) disrupts co-worker relationships, (iii) erodes a close working relationship premised on personal loyalty and confidentiality, (iv) interferes with the speaker's performance of her or his duties, or (v) obstructs the routine operation of the office." *Hyland v. Wonder*, 972 F.2d 1129, 1139 (9th Cir. 1992). "The employer need not establish that the employee's conduct *actually* disrupted the workplace— 'reasonable predictions of disruption' are sufficient." *Nichols*, 657 F.3d at 933 (quoting *Brewster v. Bd. of Educ.*, 149 F.3d 971, 979 (9th Cir. 1998)) (emphasis in original). Although courts must accord "significant weight" to an employer's reasonable judgments about the workplace, the *Pickering* analysis requires that the prediction be supported by evidence and not "rank speculation or bald allegation." *Id.* at 933-34.

In this case, it is undisputed that Godwin's association with the Vagos did not result in actual workplace disruption. The Ninth Circuit held that the record at summary judgment and on appeal did not support the State Defendants' predictions of future disruption. *Godwin*, 656 F.

App'x at 876-77. On remand, the State Defendants move for summary judgment on the basis of qualified immunity. For reasons that are unclear, no qualified immunity argument was made in the original motion for summary judgment and so the issue was not addressed by the Ninth Circuit on appeal.[3] *Id.* at 875 n.2.

## II. Qualified Immunity

A defendant is entitled to qualified immunity if his or her conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The qualified immunity analysis requires a court to address two questions: (1) whether the facts alleged or shown by the plaintiff establish a constitutional violation and (2) whether the right at issue was clearly established at the time. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The right must have been clearly established at the time of the defendant's alleged misconduct, so that a reasonable official would have understood that, under the circumstance, what he or she was doing violated that right. *Wilson v. Layne,* 526 U.S. 603, 615 (1999). Courts have discretion in deciding which prong to address first, depending on the circumstances of the case. *Pearson v. Callahan*, 555 U.S. 223, 242-43 (2009).

The Supreme Court has repeatedly admonished courts "not to define clearly established law at a high level of generality." *Mullenix v. Luna*, ___U.S.___, 136 S. Ct. 305, 308 (2015) (internal quotation marks and citation omitted). "The dispositive question is whether the violative nature of particular conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.*

---

[3] It is easy to be critical from the position of hindsight, but qualified immunity is typically raised as a bar to litigation early in the case. The parties would have saved themselves much cost and delay had this routine motion been filed at the outset.

Even if a right is clearly established, qualified immunity protects an official from reasonable mistakes about the legality of his actions. *Wilkins v. City of Oakland*, 350 F.3d 949, 954-55 (9th Cir. 2003). The official is still entitled to qualified immunity if the official "could have believed, 'reasonably but mistakenly . . . that his or her conduct did not violate a clearly established constitutional right.'" *Skoog v. Cnty. of Clackamas*, 469 F.3d 1221, 1229 (9th Cir. 2006) (quoting *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001)). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal quotation marks and citation omitted).

The Court will assume for the purposes of this motion that, based on the Ninth Circuit's holding in *Godwin*, a constitutional violation has been established. The case will therefore turn on whether the right in question was clearly established in 2010 when the State Defendants terminated Godwin's contract. As previously noted, this inquiry depends on the specific context of the case and not general or abstract statements of rights.

The Ninth Circuit has observed that the *Pickering* analysis "requires particularized balancing based on the unique facts presented in each case." *Moran v. Washington*, 147 F.3d 839, 845 (9th Cir. 1998) (internal quotation marks and citation omitted). "Because the underlying determination pursuant to *Pickering* whether a public employee's speech is constitutionally protected turns on a context-intensive, case-by-case balancing analysis, the law regarding such claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity under *Harlow* and its progeny." *Id.* at 847.

In this case, although the Ninth Circuit reversed the grant of summary judgment based on the *Pickering* analysis, Judge Bea's dissent demonstrates that contrary conclusions could be

drawn from state of the law as it existed in 2010.[4] *Godwin*, 656 F. App'x at 877-79. Judge Bea particularly noted the Ninth Circuit's decision in *Dible v. City of Chandler*, 515 F.3d 918 (9th Cir. 2008) and the Second Circuit's decision in *Locurto v. Guliani*, 447 F.3d 159 (2d Cir. 2006).

In *Dible*, a city police officer was terminated for operating a for-profit pornography website and he challenged his termination on First Amendment grounds. *Dible*, 525 F.3d at 922, 924. The court noted that the city's interest in maintaining an effective and efficient police department was "particularly strong," and that it was obvious that public knowledge of Dible's activities would be detrimental to the mission and functions his employer. *Id.* at 928.

> Police departments, and those who work for them, are engaged in a dangerous calling and have significant powers. The public expects officers to behave with a high level of propriety, and, unsurprisingly, is outraged when they do not do so. The law and their own safety demands that they be given a degree of respect, and the sleazy activities of Ronald and Megan Dible could not help but undermine that respect. Nor is this mere speculation.

*Id.*

In *Locurto*, the plaintiffs were two New York City police officers and a fireman who were terminated for participating in a racist parade float. *Locurto*, 447 F.3d at 163. The plaintiffs had received positive performance reviews from their supervisors and there were no reports of difficulties between the plaintiffs and any coworkers or members of the public. *Id.* at 163-64. The Second Circuit held that a government employer may, in some circumstances, "legitimately regard as 'disruptive' expressive activities that instantiate or perpetuate a widespread public perception of police officers and firefighters as racist." *Id.* at 178.

> Police officers and firefighters alike are quintessentially public servants. As such, part of their job is to safeguard the public's opinion of them, particularly with regard to a community's view of the respect that police officers and firefighters

---

[4] The State Defendants argue that the disagreement among reasonable jurists about the outcome of the *Pickering* balancing test when applied to the facts of this case is itself strong evidence that the right in question was not "clearly established," such that the defendant officials would have understood that their conduct violated Godwin's rights.

> accord members of that community. . . .Where a Government employee's job quintessentially involves public contact, the Government may take into account the public's perception of that employee's expressive acts in determining whether those acts are disruptive of the Government's operations.

*Id.* at 178-79.

Although Godwin was a religious services and volunteer coordinator at a youth correctional facility and not a police officer, the reasoning put forth in *Dible* and *Locurto* could easily apply to him. OYA employees work in a difficult and sensitive environment and they are given significant responsibilities, including mentoring at-risk youth.[5] The state has charged OYA with "holding youth offenders accountable and providing opportunities for reformation in safe environments." Lippold Decl. Ex. 1, at 1. Like police officers, the public reasonably expects OYA employees to behave with a high degree of propriety and Godwin's position as the RVYCF volunteer coordinator "quintessentially involved public contact." *See* Second Lippold Decl. Ex. 4, at 5 (Jerin expressed concern about Godwin "[w]orking with the community, soliciting volunteers to come into the facility, working with the religious organizations in the community."). His role as mentor and chaplain to the residents of RVYCF was also a position of public contact and grave responsibility. Superintendent Jerin directly acknowledged the public perception of similarity between corrections and police agencies in his deposition:

> People would assume that [Godwin is] engaged in criminal activity and supporting it in the community, where correctional facilities are similar to a police agency and there's a code of conduct that you don't engage in criminal activity. So that would have made his work very difficult to do in a facility, working with staff, with that reputation.

Second Lippold Decl. Ex. 4, at 7.

---

[5] Director Peters said as much in her deposition: "Juvenile corrections is very unique. It's very complex. You're dealing with young minds who are attempting to be transformed and changed. And we ask a lot of those individuals who come to those facilities—either as full time staff, volunteers, or contractors—to really help role-model for these offenders in changing their lives." Lippold Decl. Ex. 9, at 8.

If a police officer could be lawfully terminated for engaging in racist or "sleazy" conduct, it would have been reasonable for the State Defendants to conclude that an OYA contractor could be terminated for his public expressions of support for a criminal organization. The fact that the Grants Pass police called OYA headquarters to report their concerns about Godwin may be viewed as an indication of the wider public's likely reaction, should Godwin's association have become generally known. In their depositions, the State Defendants all expressed their belief that Godwin's public association with a criminal organization ran contrary to the mission and purpose of the OYA and their fear that his involvement with the Vagos would compromise efforts to rehabilitate those placed in OYA care. As Judge Bea points out in his dissent:

> Regardless of whether Godwin's association with the Vagos *actually* interfered with OYA's mission, OYA senior management reasonably predicted that the conflict between his employer's mission and Godwin's activities would undermine public respect for OYA and thereby impair OYA's ability to effectively rehabilitate youth offenders. *Dible* and *Locurto* hold this is enough to justify a grant of judgment in the government's favor.

*Godwin*, 656 F. App'x at 876 (Bea, J. dissenting).

In light of *Dible* and *Locurto*, and for the reasons set forth by Judge Bea in his dissent, the Court concludes that this is not one of the rare *Pickering* cases where the right in question was "clearly established" at the time of the challenged conduct. *See Moran*, 147 F.3d at 847.

Qualified immunity is meant to protect "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks and citation omitted). The Court cannot conclude that the State Defendants deserve either label. They were presented with information indicating that a contractor at one of their youth correctional facilities had an ongoing association with a dangerous criminal organization and was publically wearing the insignia of that organization. They knew that Godwin's role as volunteer coordinator involved working with the community and that his role as chaplain involved

mentoring impressionable and at-risk young people. Based on that information, the State Defendants concluded that Godwin's continued employment represented a risk of disruption to the functioning of RVYCF as a workplace and damage to the public perception of OYA and its mission; a risk of recidivism among the at-risk youth who might emulate Godwin's association with the Vagos; and a previously undetected, but potentially ongoing security concern for the facility itself.

The Ninth Circuit's *Godwin* decision makes it clear that the defendant officials erred, both in their factual determinations and in their understanding of the law, but the Court concludes that those mistakes were reasonable based on the information available to them at the time. Accordingly, the Court concludes that the State Defendants are entitled to qualified immunity.

At oral argument, Godwin conceded that a grant of qualified immunity will moot his own motion for summary judgment. The Court will not, therefore, address the substance of that motion.

## CONCLUSION

For the reasons set forth above, the State Defendants' Motion for Summary Judgment, ECF No. 130, is GRANTED on the basis of qualified immunity. As the granting of Defendants' motion will dispose of all claims and defendants remaining in the case, all other pending motions are DENIED as MOOT and final judgment shall be entered.

It is so ORDERED and DATED this __31st__ day of August, 2017.

                                            s/Michael J. McShane
                                            MICHAEL McSHANE
                                            United States District Judge